## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

ROBIN and VICKY WALKER,　　　)
as parents and next friends of　　)
REBECCA WALKER,　　　　　　)
　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　)　　　　7:17-cv-00381-LSC
　　v.　　　　　　　　　　　　)
　　　　　　　　　　　　　　)
TUSCALOOSA COUNTY　　　　)
SCHOOL BOARD, *et al.*,　　　　)
　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　)
　　　　　　　　　　　　　　)

### MEMORANDUM OF OPINION

Plaintiffs, Robin and Vicky Walker, have sued on behalf of their daughter, Rebecca Walker, claiming that she was sexually assaulted after her special education teachers left her unattended with another student. Before the Court are Defendants', Tuscaloosa County School Board ("the County Board"), Tuscaloosa City School Board ("the City Board"), and Amy Burnett and Amy Williamson (collectively "Defendants"), motions for summary judgment (docs. 63, 66, and 68) and Plaintiffs' motion to strike (doc. 79). The motions have been briefed and are ripe for review. For the reasons stated below, Defendants' motions for summary judgment (docs. 63, 66, and 68) are due to be granted in part and Plaintiffs' motion to strike (doc. 79) is due to be denied as moot.

# I. BACKGROUND[1]

## A. REBECCA WALKER AND THE CROSSINGPOINTS PROGRAM

Rebecca Walker graduated from Hillcrest High School, a school in the Tuscaloosa County School System, in 2012. (Doc. 58. at ¶ 1.) Because of her Down Syndrome, she was a special education student while enrolled in the County School System. (*Id.* at ¶ 2.) When she graduated from high school, she applied for and was accepted into the CrossingPoints program ("CPP"). (*Id.* at ¶ 3.)

CPP is a collaborative educational program between the University of Alabama ("UA"), the County Board, and the City Board. (*Id.* at ¶ 4.) It serves students with significant disabilities ages 18–21 years. (*Id.* at ¶ 5.) As part of CPP, students receive class room instruction on certain days, go to various jobs on certain days, and participate in recreational activities on other days. (*Id.* at ¶ 14.) As students near the completion of the program, they are taken to various local businesses in and around Tuscaloosa to submit job applications. (*Id.* at ¶ 15.)

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . ." (internal quotations omitted)).

The City Board and County Board each provide resources for CPP. As part of the agreement between UA and the City Board, the City Board provides teachers and paraeducators for the program. (*Id.* at ¶ 7.) Defendants Amy Williamson and Amy Burnett are a special education teacher and a paraeducator, respectively. (*Id.* at ¶¶ 8–9.) They are both employed by the City Board and assigned to CPP. (*Id.*) Through another agreement between UA and the County Board, the County Board provides transportation to and from UA for CPP students who previously attended County schools. (*Id.* at 11.)

The policies, procedures, and guidelines for CPP are chosen by CPP administrators, including Dr. Kagenda Matua and her team. (Defs' Ex. G at 29.) Representatives for the City Board and County Board both consult with CPP administrators in the development of CPP policies. (Defs' Ex. C at 17.) CPP administrators ultimately decide what policies will be implemented. (Defs' Ex. G at 32.) However, at least one City Board official is unaware of any instance in which a recommended policy change was rejected. (*Id.*)

Prior to March 10, 2015, there were no policies at CPP with respect to whether teachers and paraeducators could leave students on school vans. (Defs' Ex. D at 125.) Further, CPP staff were not trained at the beginning of each school year on the prevention of student-on-student sexual harassment or assault. (*Id.* at 142.)

However, neither City Board officials nor County Board officials ever recommended that CPP adopt such policies. (*See* Defs' Ex. G at 34 & Defs' Ex. F at 109.)

## B. D.J.'S DISCIPLINARY HISTORY AND DEFENDANTS' REMEDIAL MEASURES

D.J. was one of Rebecca's peers at CPP. (Doc. 58 at ¶ 17.) He suffers from an intellectual disability and had an IQ of 43 on or about March 10, 2015. (*Id.* at ¶ 19.) D.J.'s individualized education plan ("IEP") for 2014–2015 stated that he would require transportation as a related service and would need bus assistance and adult support during transportation. (Pl's Ex. 6 at 172.) One of the individuals responsible for implementing D.J.'s IEP was Amy Williamson. (Pl's Ex. 1 at 294.)

During the 2013-2014 school year, D.J. received numerous disciplinary write-ups for behavior while riding a County school bus that transported him between his home and CPP. (Doc. 58 at ¶ 40.) His behavior included acts such as yelling, tripping other students, and refusing to stay in his seat. (Pl's Ex. 12 at 329–36.) Defendant Williamson received each of D.J.'s disciplinary referrals either on the same day or the next day. (Defs' Ex. L at 70.) D.J.'s behavior resulted in his suspension from the County bus during the 2013-2014 school year. (Pl's Ex. 1 at 354.)

Although D.J.'s behavior on the County bus improved at the beginning of the 2014-2015 school year, he received several write-ups during December 2014. (Pl's Ex. 12 at 326–28.) These write-ups generally resulted from the same disruptive behavior that characterized the 2013-2014 school year. (*See id.*) However, on

December 3, 2014, D.J. received another write-up when he commented on the appearance of one student's young female babysitter and noted "what he would do with her." (*Id.* at 326.) D.J. continued to receive disciplinary write-ups for his behavior on the bus as late as March 9, 2015. (*Id.* at 325.)

In December 2014 and January 2015, Williamson and fellow CPP teacher Olivia Robinson twice met with D.J.'s mother to discuss his behavior on the bus and what could be done to correct it. (Pl's Ex. 1 at 339, 341–44.) As D.J.'s behavioral issues continued, Robinson notified Patricia Powell, a County Board official. (*Id.* at 339, 345, 352.) Specifically, Robinson informed Powell of D.J.'s general behavioral issues, making no express reference to the lewd comment made on December 3, 2014. (*Id.*)

Powell forwarded Robinson's concerns and a draft student behavioral contract to Lisa Hembree, the County Board's behavioral specialist. (*Id.*) Robinson contacted Hembree and explained D.J.'s disciplinary issues. (*Id.* at 354.) Again, Robinson did not reference the lewd comment made on December 3, 2014. (*Id.*) Hembree conferred with Robinson and helped develop the student behavioral contract to address D.J.'s behavior. (*Id.* at 358.) Defendant Williamson also took part in this process. (Defs' Ex. L at 88.) However, the contract was not completed and signed by all parties until March 10, 2015. (Pl's Ex. 1 at 359.)

## C. The Incident on March 10, 2015

On March 10, 2015, Defendants Williamson and Burnett left campus to take Rebecca, D.J. and two other students to submit job applications at various local businesses. (Doc. 58 at ¶ 18.) The students were transported on a CPP van owned by the University of Alabama. (*Id.* at ¶ 20.) The group went first to Lowe's in Northport. (*Id.* at ¶ 21.) The van was parked in the front of the parking lot, near the front door. (*Id.* at ¶ 22.) Because Rebecca and D.J. did not plan to apply for jobs at Lowe's, they remained in the van while Williamson and Burnett escorted the other two students into the store. (*Id.* at ¶¶ 23–24.)

The plan was for Williamson to assist a student in filling out an application at one kiosk while Burnett assisted the other student in starting an application at the other kiosk before returning to the van. (*Id.* at ¶ 25.) Upon discovering that the store had only one kiosk, Defendant Burnett and one of the students immediately returned to the van. (*Id.* at ¶¶ 26–27.) In total, Burnett was away from the van for less than five minutes. (Defs' Ex. D at 124.)

Upon returning to the van, Burnett noticed that Rebecca's face was red. (Doc. 58 at ¶ 28.) At Burnett's questioning, Rebecca revealed that D.J. had touched her breasts and had touched her between her legs. (*Id.* at ¶¶ 29–30.) Burnett contacted Williamson, and the pair chose to return to campus to follow up on Rebecca's

allegations. (*Id.* at ¶ 31 & ¶ 35.)

Upon returning to campus, Williamson notified Rebecca's mother of the incident. (*Id.* at ¶ 36.) Rebecca's mother then took Rebecca to DCH Regional Medical Center to be examined by a physician. (*Id.* at ¶¶ 37–38.)

CPP officials also notified Patricia Powell at the County Board of Rebecca's allegations. (*Id.* at ¶ 39.)

## D. THE AFTERMATH

Following the alleged incident on March 10, 2015, D.J. was suspended from CPP pending a meeting with his IEP team. (*Id.* at ¶ 42.) An IEP team meeting was held on March 23, 2015, at which time a manifestation determination review was conducted and a determination was reached that D.J. had committed a Class III offense. (*Id.* at ¶ 43.) He was placed on homebound services for the remainder of the year, and he was not allowed to participate in CPP activities such as the spring dance and graduation. (*Id.* at ¶¶ 43–44.)

Rebecca Walker has not seen D.J. since the March 10, 2015 incident. (*Id.* at ¶ 45.) She returned to CPP the following day and appeared in good spirits. (Defs' Ex. H at 174–75.) Rebecca continued taking part in CPP activities, attending both the spring dance and graduation. (Doc. 58 at ¶ 48.) She completed the program and received a certificate. (*Id.* at ¶ 47.) Since the incident, however, Rebecca has

experienced emotional distress, including nightmares, the need for counseling, and a feeling of anxiety upon seeing a van that resembles a CPP van. (Defs' Ex. K at 68, 70 & Pl's Ex. 14 at 12–14.)

## II.  STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms.*, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal*

*Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III. DISCUSSION

### A. PLAINTIFFS' MOTION TO STRIKE

Plaintiff moves to strike certain evidentiary materials submitted by Defendants in support of their motions for summary judgment. (Doc. 79.) The

materials to which Plaintiffs object are the affidavit of Defendant Amy Williamson (Def's Ex. M), the affidavit of Defendant Amy Burnett (Def's Ex. N), and the affidavit of Bruce Prescott (Def's Ex. O). In evaluating Defendants' motions for summary judgment, the Court does not rely upon those evidentiary submissions. Accordingly, Plaintiffs' motion to strike is due to be denied as moot.

## B. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### 1. TITLE IX CLAIMS AGAINST THE CITY BOARD AND COUNTY BOARD

Title IX states, in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Student-on-student sexual harassment, "if sufficiently severe, can . . . rise to the level of 'discrimination' actionable under the statute." *Davis, through next friend LaShonda D. v. Monroe Cty Bd. of Educ.*, 526 U.S. 629, 630–31 (1999).

"A plaintiff seeking recovery for a violation of Title IX based on student-on-student harassment must prove four elements." *Williams v. Bd. of Regents of Univ. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007). First, the defendant must be a Title IX funding recipient. *Id.* Second, "an 'appropriate person' must have actual knowledge of discrimination or harassment the plaintiff alleges occurred." *Id.* (citing *Gebser v.*

*Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). Next, the defendant must have acted with deliberate indifference. *Williams*, 477 F.3d at 1293. Finally, "the discrimination must be 'so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.'" *Id.* (quoting *Davis*, 526 U.S. at 633).

The parties do not dispute that both the City Board and the County Board are Title IX funding recipients. However, as explained below, Plaintiffs have failed to show a genuine dispute as to the remaining elements of their Title IX claim.

### a. ACTUAL KNOWLEDGE BY AN APPROPRIATE PERSON

To state a Title IX claim against either the City Board or County Board, Plaintiffs must first show that an appropriate person had actual knowledge of the alleged discrimination or harassment. The Court will address each defendant in turn.

### i. WHETHER AN APPROPRIATE PERSON WITH THE CITY BOARD HAD ACTUAL KNOWLEDGE

The Court must first determine who among the City Board could qualify as an appropriate person. "[T]he ultimate question of who is an appropriate person is necessarily a fact-based inquiry because officials' roles vary among school districts." *Doe v. Sch. Bd. of Broward Cty, Fla.*, 604 F.3d 1248, 1256 (11th Cir. 2010). "[T]he official with notice . . . must be 'high enough up the chain-of-command that his [or her] acts constitute an official decision by the school district itself not to remedy the

misconduct.'" *Id.* at 1255 (quoting *Floyd v. Waiters*, 171 F.3d 1264, 1264 (11th Cir. 1999)). At a minimum, an appropriate person is an "official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290.

Plaintiffs identify Defendant Williamson as an appropriate person whose actual knowledge could be imputed to the City Board.[2] At all relevant times, Defendant Williamson acted as a special education teacher employed by the City Board and assigned to CPP. She was responsible for implementing D.J.'s IEP and was involved in the creation of D.J.'s student behavioral contract. Although defendants argue that Williamson lacked "full disciplinary authority" over D.J. (doc. 69 at 14), that very argument concedes that Williamson had some authority through which she could address D.J.'s behavior.

A schoolteacher may qualify as an appropriate person. *J.S., III by and through J.S., Jr. v. Houston Cty Bd. of Educ.*, 877 F.3d 979, 989 (11th Cir. 2017). Indeed, the Eleventh Circuit has found a fact question of whether a teacher was an appropriate person where the teacher "was not 'totally responsible' for an aide's supervision."

---

[2]    Plaintiffs do not dispute that, as a paraeducator, Defendant Burnett lacked the authority necessary to render her an appropriate person in this case. *See Hill v. Cundiff*, 797 F.3d 948, 971 (11th Cir. 2015) (holding that a teacher's aide was not an appropriate person where "[n]o evidence in the record suggests teacher's aides at [the victim's school] have the authority to discipline students for sexual harassment").

*Id.* Therefore, the Court finds that, although Defendant Williamson lacked full authority to discipline D.J., a fact question exists as to whether Defendant Williamson is an appropriate person whose knowledge could be imputed to the City Board.

But the question remains as to whether Defendant Williamson had "actual knowledge of the discrimination or harassment the plaintiff has alleged." *Williams*, 477 F.3d at 1293. Liability under Title IX does not require that the defendant had actual notice of harassment of the plaintiff-victim. *Broward Cty*, 604 F.3d at 1254. Moreover, a Title IX student-on-student harassment action may proceed even "where the primary substance of [the prior notice] differed significantly from the circumstances of the plaintiff's harassment." *Id.* at 1257. However, "some prior allegations of harassment may be sufficiently minimal and far afield from the conduct underlying the plaintiff's Title IX claim that they would not alert a school district official of the risk of a Title IX plaintiff's sexual harassment." *Id.* at 1258 (citing *Gebser*, 524 U.S. at 291). For example, in *Gebser*, the Supreme Court noted that a single complaint from parents charging that a teacher had made "inappropriate comments during class" was "plainly insufficient" to provide actual knowledge of the teacher's sexual relationship with a student. 524 U.S. at 291.

Here, D.J. had a history of disruptive behavior on the County bus that

transported him to and from CPP each day. In the 2013–2014 year, D.J. received eight disciplinary write-ups from his bus driver, resulting in D.J.'s suspension from riding the bus during that year. (Pl's Ex. 12 at 329–36.) In December 2014, D.J. received an additional three write-ups in the span of three days. As late as the day before the incident with Rebecca, D.J. continued to receive disciplinary write-ups for his behavior on the bus. D.J. engaged in various forms of disruption, including shouting, tripping other students, and refusing to stay seated. Plaintiffs rely heavily on an incident occurring on December 3, 2014, wherein D.J. "said something about [a young woman's] looks and what he would do with her." (*Id.* at 326.)

The record indicates that Defendant Williamson knew of D.J.'s history of disciplinary issues while riding the County bus each day.[3] Defendant Williamson testified that she received a copy of each disciplinary write-up within a day after each was made. Further, she and Olivia Robinson twice met with D.J. and his mother to discuss D.J.'s continuing disciplinary issues.

The only remaining question is whether knowledge of D.J.'s disciplinary record constituted "actual knowledge of the discrimination or harassment" that

---

[3]     The record also indicates that D.J. had some behavioral issues while riding the Crimson Ride during school hours. (Defs' Ex. E at 65–66.) However, Plaintiffs have presented no evidence that Defendant Williamson or any other employee of the City Board had actual knowledge of such problems. Indeed, the record indicates the opposite. (*See id.* at 68–69.) (CPP teacher John Myrick's statement that no complaints were made about D.J.'s minor disruptions on the Crimson Ride and that Myrick only knew of them through personal observation).

Plaintiffs have alleged. In analyzing the "actual knowledge" element, the Eleventh Circuit has distinguished between notice of "mere inappropriate comments" such as those in *Gebser* and notice of sexual harassment involving "both a verbal and physical component." *Broward Cty*, 604 F.3d at 1258. In *Broward County*, a high school math teacher was twice reported by students for sexual harassment—which included the teacher's attempts to lift the victims' skirts—before his attack on the plaintiff. *Id.* at 1248. In *Williams*, the student responsible for a student-on-student attack was recruited and given a full scholarship to play basketball by the defendants, despite their knowledge that he had been dismissed from two other basketball programs for sexual harassment and sexual assault. 477 F.3d at 1282. The Eleventh Circuit held that defendants had actual knowledge in both cases.

Those situations differ from the one in this case, where the only prior occasions that could give the City Board knowledge of a need to supervise D.J. for possible sexual assault were a series of disruptive acts and one inappropriate comment about a non-student's looks and "what he would do with her." These incidents do not rise to the severity of the prior incidents that provided knowledge in *Broward County* and *Williams*. Instead, the incidents fall far closer to the "inappropriate comments" made in *Gebser*. 524 U.S. at 291. In this case, D.J.'s disruptive behavior and single inappropriate comment could not have alerted anyone

to a possible propensity for sexual assault. "The real world of school discipline is a rough-and-tumble place where students practice newly learned vulgarities, erupt with anger, tease and embarrass each other, share offensive notes, flirt, push and shove in the halls, grab and offend." *Davis*, 526 U.S. at 673. D.J.'s prior acts of yelling, tripping other students, and refusing to remain in his seat bear no relation to an incident of sexual assault. And at most, D.J.'s single inappropriate comment in December 2014 was significant only in hindsight.

In short, the prior incidents alleged here are "sufficiently minimal and far afield from the conduct underlying the plaintiff's Title IX claim that they would not alert a school district official of the risk of a Title IX plaintiff's sexual harassment." *Broward County*, 604 F.3d at 1258. Accordingly, summary judgment is due to be granted to the City Board on this claim.

### ii. WHETHER AN APPROPRIATE PERSON WITH THE COUNTY BOARD HAD ACTUAL KNOWLEDGE

The Court now turns to whether an appropriate person at the County Board had actual knowledge of prior harassment or discrimination. There is no dispute that either Patricia Powell, the County Board Special Education Coordinator, or Lisa Hembree, the County Board behavioral interventionist, could qualify as an "appropriate person" under Title IX. Therefore, the Court need only determine whether either Powell or Hembree possessed sufficient actual knowledge.

The record indicates that, prior to the incident with Rebecca, Powell and Hembree knew only that D.J. had a history of mouthing off to the bus driver, making fun of younger students on the bus, yelling inappropriately out of the bus window, getting in the bus driver's seat on one occasion, and generally being disruptive. (*See* Pl's Ex. 1 at 362–66.) The County Board did not learn of D.J.'s inappropriate December 3 comment until six months after the incident with Rebecca. (Defs' Ex. F at 125–26.) The County Board thus had *less* actual knowledge of prior harassment than did the City Board. For the same reasons that Plaintiffs have failed to show that the City Board had actual knowledge, they have thus also failed to show that the County Board had actual knowledge. Accordingly, summary judgment is due to be granted to the County Board on this claim.

### b. Deliberate Indifference by the Title IX Funding Recipient

Even if the prior incidents alleged by Plaintiffs were enough to constitute knowledge of a need to supervise, Plaintiffs do not show that either the City Board or County Board acted with deliberate indifference. To be deliberately indifferent, a school's response to harassment must amount to "an official decision . . . not to remedy the violation." *Gebser*, 524 U.S. at 276. The deliberate indifference standard requires that "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648–49. A defendant

does not act with deliberate indifference simply because it fails to adopt the plaintiff's preferred remedy. *Id.* at 648. Nor does the ineffectiveness of the policies implemented by a defendant render the defendant deliberately indifferent. *See Sauls v. Pierce Cty Sch. Dist.*, 399 F.3d 1279, 1285–86 (11th Cir. 2005).

The unreasonableness of a defendant's response is evaluated "in light of the known circumstances." *Davis*, 526 U.S. at 648. "A clearly unreasonable response causes students to undergo harassment or makes them more vulnerable to it." *Hill*, 797 F.3d at 975. The deliberate indifference standard is "rigorous and hard to meet." *Id.* "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 648–49.

As explained below, Plaintiffs have failed to show that either the City Board or the County Board was deliberately indifferent to D.J.'s prior misbehavior or his sexual assault of Rebecca.

### i. WHETHER THE CITY BOARD WAS DELIBERATELY INDIFFERENT

The Court will first look at the City Board's response to D.J.'s behavior, both before and after the incident on March 10, 2015.

As an initial matter, Plaintiffs do not rely on the City Board's response to Rebecca Walker's injuries. Rather, "Plaintiffs' Title IX claim . . . is based

on . . . conduct prior to the March 10, 2015, incident involving Rebecca Walker and DJ." (Doc. 80 at 21.) Regardless, the Court notes that the City Board and CPP acted quickly to prevent further harm to Rebecca and others, investigating the incident and placing D.J. on homebound services for the remainder of the year. The City Board's actions thus stand apart from other cases wherein Title IX recipients acted with deliberate indifference to address harm suffered by a plaintiff. *See, e.g.*, *Williams*, 477 F.3d at 1297 (holding that Defendants' failure to adequately discipline the plaintiff's assailants for over eight months was a part of the discriminatory conduct).

Rather than rely on the City Board's post-incident conduct, Plaintiffs instead argue that the City Board's failure to implement or recommend new policies at CPP constitutes deliberate indifference. "[A] court can find a Title IX violation when a university exhibits deliberate indifference before an attack that makes a student more vulnerable to the attack itself . . . ." *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1346 (M.D. Ga. 2007) (citing *Davis*, 526 U.S. at 645). Plaintiffs argue that, in failing to ensure that CPP had adequate sexual harassment and supervision policies, the City Board made Rebecca more vulnerable to D.J.'s assault. However, Plaintiffs' argument suffers from three principal defects.

First, the facts of this case present a novel situation in which the City Board lacked authority to implement unilaterally any policies at CPP. CPP is a collaborative

program: the University of Alabama makes final decisions, and the City Board and County Board each provide resources and feedback. The question of whether CPP would implement new sexual harassment or transportation policies ultimately fell to Dr. Matua and other UA employees. Plaintiffs have cited no authority for the proposition that the failure to make a policy recommendation can constitute deliberate indifference. To be sure, the record does not indicate that the City Board's policy recommendation would have been rejected, but the fact remains that the City Board lacked final authority to implement Plaintiffs' preferred policies.

Second, failure to adopt Plaintiffs' preferred policies does not, by itself, constitute deliberate indifference. *Davis*, 526 U.S. at 648 (rejecting concerns that the deliberate-indifference standard would provide "victims of peer harassment" with a "Title IX right to make particular remedial demands"). To this end, the Supreme Court has noted that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* The Court must view the City Board's failure to recommend policies for CPP transportation under all relevant circumstances to determine whether it was clearly unreasonable.

Third, and most importantly, the City Board, through Defendant Williamson, took remedial measures inconsistent with an "official decision . . . not to remedy the violation." *Gebser*, 524 U.S. at 276. In response to D.J.'s misbehavior in the 2013–

2014 school year, Defendant Williams and other CPP teachers worked with D.J. using social stories and instruction centered on appropriate bus behavior and positive ways to get attention. (Defs' Ex. L at 72, 80–82.) As D.J.'s behavior continued, he was suspended from riding the County bus to and from CPP for some time during the 2013–2014 school year. (Defs' Ex. E at 78.) During the 2014–2015 school year, Williamson's fellow teacher Olivia Robinson stayed in frequent contact with D.J.'s bus driver, keeping track of D.J.'s behavior. (Defs' Ex. H at 92–93.) On December 8, 2014, Williamson and Olivia Robinson met with D.J. and his mother to discuss D.J.'s bus behavior and whether D.J.'s mother should continue transporting D.J. herself. (Pls' Ex. 1 at 339.) On January 8, 2015, Williamson and Olivia Robinson again met with D.J.'s mother to discuss D.J.'s continued misbehavior on the County bus. (*Id.* at 344.) Finally, Defendant Williamson, Olivia Robinson, and certain County Board officials collectively developed a student behavioral contract that applied to D.J.'s behavior on the County bus. (Defs' Ex. L at 88.)

Plaintiffs nevertheless argue that the City Board's failure to address potential misconduct on *CPP* transportation amounted to deliberate indifference. To be sure, the remedial actions taken by Defendant Williams and her fellow CPP teachers addressed only D.J.'s misbehavior on the County school bus. However, the record does not indicate that Defendant Williamson or any other City Board official was

aware of any bad behavior on CPP transportation. On the contrary, Defendant Williamson testified that she was aware only of D.J.'s bad behavior while riding the County bus. (Defs' Ex. L. at 89.) In other words, the record indicates that Defendant Williamson knew only of D.J.'s behavioral problems while riding the County bus and accordingly acted along with other CPP teachers in addressing those problems.

In *Davis*, the Supreme Court found deliberate indifference where the defendants "made no effort either to investigate or to put an end to the harassment." *Davis*, 526 U.S. at 654. By contrast, in *Sauls*, the Eleventh Circuit held that deliberate indifference was absent where the defendants responded to each report of misconduct they received by investigating each allegation, monitoring the assailant's conduct, and warning her about interactions with other students. 399 F.3d at 1285. Given the actions taken by Defendant Williams and her fellow CPP teachers, the instant case hues closer to *Sauls* than to *Davis*.

Plaintiffs have thus failed to show that the City Board acted with deliberate indifference. Accordingly, summary judgment is due to be granted to the City Board on this claim.

### ii. WHETHER THE COUNTY BOARD WAS DELIBERATELY INDIFFERENT

The Court will now examine whether the County Board acted with deliberate indifference. As against the City Board, Plaintiffs base their Title IX claim against

the County Board on a failure to take preventative measures *before* the assault on Rebecca. (Doc. 81 at 16.) ("The County Board was deliberately indifferent *before* the sexual assault of Rebecca Walker took place . . . . (emphasis added)). Regardless, as with the City Board, the Court notes that the County Board did take significant remedial measures following Rebecca's sexual assault.

Whether the County Board's preventative measures prior to the assault were clearly unreasonable must be evaluated "in light of the known circumstances." *Davis*, 526 U.S. at 648. Prior to the incident on March 10, 2015, the County Board knew only of D.J.'s unruly acts such as shouting and refusing to stay in his seat. This information indicated only that D.J.'s behavior needed to be addressed. The record indicates that the County Board did attempt to address that behavior.

The County Board first became aware of D.J.'s disciplinary issues through communications between Olivia Robinson and Patricia Powell in January 2015. In February 2015, Robinson asked for assistance in developing a behavioral contract for D.J. that would document his behavior on the bus. Powell immediately forwarded the request and draft contract to Lisa Hembree, the County Board's behavioral specialist.

Hembree met with Robinson on March 3, 2015 to discuss D.J.'s behavior and to develop his behavioral contract. Hembree made several suggestions for

implementing the contract. (Pl's Ex. 1 at 358.) First, she advised Robinson to teach D.J. the importance of proper behavior on the bus in five-minute lessons. (*Id.*) Second, she proposed that D.J. receive bus work assignments that would help keep him distracted. (*Id.*) Third, she advised discussing the contract in a meeting with D.J.'s mother. At this time, Hembree even spoke with D.J., advising him that she would periodically check on his bus behavior. (*Id.*)

The actions of Powell and Hembree, County Board employees, are inconsistent with an "official decision . . . not to remedy the violation." *Gebser*, 524 U.S. at 276. For the same reasons that the City Board did not act with deliberate indifference, Plaintiffs have failed to show that the County Board acted with deliberate indifference. Accordingly, the County Board is entitled to summary judgment on this claim.

### c. DENIAL OF ACCESS TO EDUCATIONAL OPPORTUNITIES

Finally, D.J.'s assault on Rebecca was not sufficient to deprive her of access to educational opportunities at the school. "In the context of student-on-student harassment, damages are only available where the behavior is so severe, pervasive, and objectively offensive that it denies its victims equal access to education." *Hawkins v. Sarasota Cty Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003). The violation must have a "systemic effect" on the victim's access to educational programs or

activities. *Id.* As a result, a single instance of peer-on-peer harassment is rarely sufficient to ground a Title IX violation. *See Davis*, 526 U.S. at 631; *see also Hawkins*, 322 F.3d at 1289 ("We take [the systemic effect requirement] to mean that gender discrimination must be more widespread than a single instance of one-on-one peer harassment and that the effects of the harassment touch the whole or entirety of an educational activity.").

The cases where the Eleventh Circuit has permitted a Title IX claim based upon a single instance of peer-on-peer harassment are exceptional. In *Williams*, the alleged attack took place in a single room over the course of two hours, but the attack itself consisted of "two separate acts of sexual assault and so constitute[d] a continuous series of events." 437 F.3d at 1298. The Eleventh Circuit concluded that the attack, when coupled with University's own failure to address the risk both before and after the fact, amounted to pervasive discrimination. *Id.* In *Hill*, the Eleventh Circuit held that a jury question existed as to whether a single incident of student-on-student harassment was sufficiently pervasive under Title IX. 797 F.3d at 972–73. However, the court stressed that the facts presented a "unique case because the administrators effectively participated in [the assailant's] sexual harassment by setting [the victim] up in a rape-bait scheme . . . in order to 'catch [the assailant] in the act.'" *Id.* at 972. As a result, the court also considered several acts

and omissions by the school administrators in determining whether the discrimination was pervasive. *Id.* In contrast to *Williams* and *Hill*, the instant case of student-on-student harassment does not present such unique circumstances.

Further, Plaintiffs have failed to show a "concrete, negative effect on either the ability to receive an education or the enjoyment of equal access to educational programs or opportunities." *Hawkins*, 322 F.3d at 1289. "It is not necessary . . . to show physical exclusion to demonstrate that students have been deprived . . . of an educational opportunity on the basis of sex." *Davis*, 526 U.S. at 651. However, Plaintiffs are required to show a "systemic effect of denying equal access to an educational program or activity." *Hawkins*, 322 F.3d at 1289.

Here, the undisputed evidence indicates that, following the incident, Rebecca continued to attend CPP. Plaintiffs have shown no decline in Rebecca grades, and she even graduated from the program. Plaintiffs cite *Hill* for the proposition that Rebecca's nightmares, anxiety, and need for counseling create a jury question on this issue. 797 F.3d at 976. However, the facts in *Hill* also involved more concrete effects on the victim's education, such as a decline in the victim's grades and her need to transfer schools. *Id.* By contrast, Plaintiffs have alleged no injury that directly relates to Rebecca's educational opportunities.

Although the facts of this case are very serious, they do not represent the sort

of severe, pervasive, and objectively offensive denial of access contemplated by *Davis* and its progeny. D.J.'s attack on Rebecca was a single incident, and both the City Board and the County Board, through CPP, took immediate action to prevent future attacks by D.J. Therefore, both the City Board and the County Board are entitled to summary judgment on Plaintiffs' Title IX claim.

## 2. ADA AND § 504 CLAIMS AGAINST THE CITY BOARD AND COUNTY BOARD

The Court now considers Plaintiffs' claims under the ADA and § 504 of the Rehabilitation Act. Defendants argue that Plaintiffs cannot recover damages for alleged violations of the ADA and § 504 because they cannot show that Rebecca was subjected to intentional discrimination because of her disability.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the ADA states that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits, services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Discrimination claims under the ADA and

[§ 504] are governed by the same standards, and the two claims are generally discussed together." *Houston Cty*, 877 F.3d at 985.

To state a claim under Title II of the ADA and § 504, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cty*, 480 F.3d 1072, 1083 (11th Cir. 2007).

Although the parties agree that Rebecca qualifies as an individual with a disability, Plaintiffs cannot show that Defendants discriminated against her because of her disability. A plaintiff suing under § 504 and the ADA must demonstrate that the defendants' actions were the result of the defendants' intentional discrimination. *Wood v. President & Trs. of Spring Hill College in City of Mobile*, 978 F.2d 1214, 1219 (11th Cir. 1992). "[A] plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference." *Liese v. Indian River Cty Hosp. Dist.*, 701 F.3d 334, 345–48 (11th Cir. 2012). Under that standard, "a plaintiff must show that the defendant 'knew that harm to a federally protected right was substantially likely' and 'failed to act on that likelihood.'" *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (emphasis omitted) (quoting *Liese*, 701 F.3d at

344). As stated in this Court's discussion of Plaintiffs' Title IX claim, Plaintiffs cannot show that Defendants were deliberately indifferent to Rebecca's rights. The instant action is not one where the defendants failed to act against a high likelihood of harm.

Plaintiffs nonetheless argue that "the failure to protect a female student diagnosed with Down syndrome from sexual assault by someone with a history of bad behavior and sexual harassment is also an act of discrimination, actionable under § 504 and the ADA." (Doc. 81 at 24.) But this argument is not persuasive, and the caselaw from this Circuit does not support such a finding. *See T.W. ex rel. Wilson v. Sch. Bd. Of Seminole Cty, Fla.*, 610 F.3d 588, 604 (11th Cir. 2010) (finding no deliberate indifference on the part of a school system that placed a student with a teacher who abused the student and had a prior "proclivity toward abuse with students," because the school system "investigated all complaints of abuse that parents lodged" against the teacher, and "were unable to substantiate the complaints"). Viewing the evidence in the light most favorable to Plaintiffs, no reasonable jury could conclude that either the City Board or the County Board intentionally discriminated against Rebecca solely by reason of her disability. Therefore, both the City Board and the County Board are entitled to summary judgment on Plaintiffs' ADA and § 504 claims.

### 3. § 1983 CLAIM AGAINST THE CITY BOARD AND THE COUNTY BOARD, AMY WILLIAMSON AND AMY BURNETT

Plaintiffs also assert claims against all Defendants for the violation of Rebecca's rights to bodily integrity, pursuant to 42 U.S.C. § 1983. For the reasons explained below, summary judgment is due to be granted to all Defendants on these claims.

### a. CLAIM AGAINST THE CITY BOARD AND THE COUNTY BOARD

### i. DUTY OF CARE

The Court first examines whether either the City Board or the County Board had a constitutional duty to protect Rebecca from D.J.'s attack. Plaintiffs claim that Rebecca's Substantive Due Process rights under the Fourteenth Amendment were violated when Defendants were deliberately indifferent to the protection of Rebecca's liberty interest in her bodily integrity. *See Hill*, 797 F.3d at 978 ("[A] governmental official . . . may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment.") "[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *Cty of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). However, "nothing in the language of the Due Process Clause itself requires the State to protect life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty Dep't of Soc. Servs.*, 489 U.S. 189, 195

(1989). "The Due Process Clause exerts limitations on a State's power to act, not as a guarantee of certain minimum levels of safety." *Id.* Only in certain limited circumstances does the Constitution require affirmative duties of care and protection from private individuals. *See id.* at 198.

Courts have identified two exceptions where the Due Process Clause imposes an affirmative duty on government actors to protect individuals. The first exception arises where the State takes a person into custody, confining him against his will. *Id.* The second exception arises where the government affirmatively acts in a manner that is "arbitrary or conscience shocking in a constitutional sense." *Waddell v. Hendry Cty Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992)). Unless Plaintiffs can show that this case falls within one of the above exceptions, their § 1983 claim will fail as a matter of law.

The Eleventh Circuit has held that public schools generally lack the requisite control over students to impose upon such institutions a constitutional duty of protection under the custody exception. *Wyke v. Polk Cty Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997). Aside from Rebecca's special needs, Plaintiffs have not alleged that her situation was different from that of any other student attending public school. Rebecca's condition is insufficient to render CPP a custodial setting under

*DeShaney*. In a factually similar but non-binding case, a special education student was sexually assaulted by another pupil on his special education school bus. *Worthington v. Elmore Cty Bd. Of Educ.*, 160 Fed. App'x 877 (11th Cir. 2005). The Eleventh Circuit held that there was not a special relationship or duty on the part of the school board, even though the plaintiff was required to attend a special school for children with learning disabilities and behavioral problems, forced to ride the bus, and suffered known mental, emotional, and behavioral disabilities. *Id.* at 881. Thus, despite Rebecca's disabilities, no constitutional duty of protection arose under the custody exception in this case.

Under the second exception, the State may violate a plaintiff's substantive due process rights if the government actor's conduct is arbitrary or conscience-shocking. *Waddell*, 329 F.3d at 1305. "To rise to the conscience-shocking level, conduct most likely must be 'intended to injure in some way unjustifiable by any government interest.'" *Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009) (quoting *Lewis*, 523 U.S. at 849). Conduct by a government actor that would amount to an intentional tort under state law would not, without more, rise to the level of a constitutional violation. *See Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002). "[O]nly the most egregious official conduct can be said to be arbitrary in a constitutional sense." *Waddell*, 329 F.3d at 1305. Indeed, the Eleventh Circuit has recognized

conscience-shocking intentional conduct by public educators "[o]nly in the limited context of due-process claims based on excessive corporal punishment." *Nix v. Franklin Cty Sch. Dist.*, 311 F.3d 1373, 1378 (11th Cir. 2002).

Plaintiffs argue that Defendants' deliberate indifference, coupled with Rebecca's vulnerability and the allegation of sexual assault, amounts to a conscience-shocking violation of Rebecca's Fourteenth Amendment rights. However, as explained above, neither the City Board nor the County Board acted with deliberate indifference.

Furthermore, the Court knows of no precedent to support the contention that a government agent's failure to protect a plaintiff from the intentional acts of a third party under these circumstances can be characterized as arbitrary or conscience-shocking in a constitutional sense. Indeed, although the Eleventh Circuit does not appear to have addressed this issue, courts in other Circuits have done so and have held that the school district does not have a duty to protect students from assault. *See Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416–17 (5th Cir. 1997) (finding no duty of school officials to protect a middle school student who was raped by a school custodian who had a known criminal record); *Doe v. Sabine Parish Sch. Bd.*, 24 F. Supp. 2d 655, 664 (W.D. La. 1998) (finding no duty on the part of school officials to protect a kindergarten student from sexual assault from another student

with a history of sexual aggression toward other students).

In *Dorothy J. v. Little Rock School District*, the Eighth Circuit addressed a similar issue where a mentally retarded high school student was sexually assaulted and raped by another student who "had a history of violent and sexually assaultive behavior." 7 F.3d 729, 731 (8th Cir. 1993). The court stated that the plaintiff's "mental retardation [does not] alter the equation. There is no allegation that the State involuntarily placed [the plaintiff] in the [special needs Community-Based Instruction] program." *Id.* at 732. The court reasoned that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf, not the individual's own limitations, that gives rise to the constitutional duty to protect." *Id.* Further, the court rejected the plaintiff's argument that the defendants created a danger when they left the plaintiff and his assailant alone unsupervised, reasoning that this argument was "just another way of saying that the school environment creates a custodial relationship giving rise to a constitutional duty to protect." *Id.* at 734. The Court finds the Eighth Circuit's reasoning in *Dorothy J.* to be persuasive and concludes that Plaintiffs have failed to show that Defendants' conduct could shock the conscience.

Plaintiffs have thus failed to show that this case falls into an exception to the general rule that the State does not owe a duty to protect private actors from

intentional acts by other private actors. Accordingly, Plaintiffs' § 1983 claim fails as a matter of law, and the City Board and County Board are entitled to summary judgment on this claim.

### ii. POLICY OR CUSTOM BY THE CITY BOARD OR COUNTY BOARD

Even if Plaintiffs could show that this case falls within an exception, Plaintiffs still have failed to show that the City Board and County Board actively violated Rebecca's rights. A municipality or county "does not incur § 1983 liability for injuries caused solely by its employees." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). To impose § 1983 liability on a municipality or county, "a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Liability may be imposed due to the existence of an improper policy or from the absence of a policy." *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).

Plaintiffs argue that that the City Board and County Board consistently failed to recommend new policies for CPP that would address student safety on CPP transportation. In effect, Plaintiffs assert that a policy of having no policy constituted

deliberate indifference to Rebecca's constitutional rights. *See id.* However, for the same reasons that the City Board and County Board were not deliberately indifferent under Title IX, the Court finds that this absence of policy did not constitute deliberate indifference under § 1983.

Plaintiffs next argue that the City Board and County Board "also failed to ensure that CrossingPoints teachers and staff were adequately trained in the prevention of sexual assault and harassment and that they adequately supervised students." (Doc. 81 at 23.) Plaintiffs cite *City of Canton*, 489 U.S. at 387, in support of this assertion. However, *City of Canton* cautioned that the "failure to train" can only be the basis of liability under § 1983 where such failure amounts to deliberate indifference. *Id.* And once again, neither the City Board nor the County Board acted with deliberate indifference to Rebecca's constitutional rights.

Plaintiffs have thus failed to allege a policy or custom of the City Board or County Board that can ground a § 1983 claim. Accordingly, the City Board and County Board are both entitled to summary judgment on this claim.

### b. QUALIFIED IMMUNITY FOR DEFENDANTS AMY WILLIAMSON AND AMY BURNETT

Defendants Williamson and Burnett assert qualified immunity against Plaintiffs' § 1983 claim. "Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate

'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Snider v. Jefferson State Cmty. College*, 344 F.3d 1325, 1327 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). If a public official asserts qualified immunity, he "must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003).

In determining whether a government employee acted within the scope of discretionary authority, the Court looks to "whether [the acts in question] are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). The government employee must be "(a) performing a legitimate job-related function (that is, pursuing the job-related goal), (b) through means that were within his power to utilize." *Id.* "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). The Court must instead "ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (quoting *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997)).

Here, the parties do not dispute that Defendants Williamson and Burnett were each acting in her discretionary function as a teacher and paraeducator, respectively.

The assault occurred when Williamson and Burnett left Rebecca and D.J. unattended in a CPP van. It is undisputed that CPP leaves supervising procedures to the discretion of teachers and paraeducators. Therefore, Defendants Williamson and Burnett have met their initial burden for establishing qualified immunity.

The burden therefore shifts to Plaintiffs to show that Defendants Williamson and Burnett are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). "To overcome qualified immunity, the plaintiff must satisfy a two-prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman*, 370 F.3d at 1264 (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)).

Only in limited circumstances will a government actor's failure to protect a plaintiff from a private person constitute a substantive due process rights violation. As explained above, the facts of this case do not fit within the custodial setting exception. Thus, Plaintiffs may only proceed if there is a factual question of whether Williamson and Burnett's decision to leave Rebecca and D.J. unattended was arbitrary or conscience-shocking. But "only the most egregious official conduct can be said to be arbitrary in a constitutional sense." *Waddell*, 329 F.3d at 1305. The conduct of Williamson and Burnett, though perhaps unreasonable, simply does not rise to the high bar that the Eleventh Circuit has set for official conduct that shocks

the conscience. *Nix*, 311 F.3d at 1378 (recognizing conscience-shocking school official conduct only in cases of excessive corporal punishment). Therefore, Plaintiffs have failed to demonstrate a constitutional violation by Williamson or Burnett.

But even if the decision to leave Rebecca and D.J. unattended in the van amounted to a constitutional violation, such violation was not clearly established at the time. "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000). "[I]n the absence of fact-specific case law, the plaintiff may overcome the qualified immunity defense when the preexisting general constitutional rule applies 'with obvious clarity to the specific conduct in question,' and it must have been 'obvious' to a reasonable police officer that the pertinent conduct given the circumstances must have been unconstitutional at the time." *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002) (quoting *Hope*, 536 U.S. at 741).

Here, Plaintiffs cannot meet their burden of overcoming Defendants' qualified immunity defense. Even if the decision to leave Rebecca and D.J. alone in the van constituted a violation of Rebecca's substantive due process rights, Plaintiffs

cannot show that such a right was clearly established at the time. Plaintiffs can cite to no pertinent case authority that would have given Defendants fair warning that a decision to leave two special-needs students briefly unattended in an air-conditioned van parked nearby could result in a violation of substantive due process rights. Indeed, the *DeShaney* authority affirmatively indicates the absence of such a right.

Plaintiffs have thus failed to overcome Defendants' qualified immunity defense. Accordingly, Defendants Williamson and Burnett are entitled to summary judgment on this claim.

### 4. REMAINING STATE-LAW CLAIMS AGAINST AMY WILLIAMSON AND AMY BURNETT

Having disposed of all pending federal-law claims, the Court now turns to Plaintiffs' remaining state-law claims for "Negligent and/or Wanton Supervision/Training," "Negligent and/or Wanton Hiring/Retention," "Negligent and/or Willful Failure to Perform Ministerial Duties," and "Tort of Outrage." (Doc. 1 at 11–14.) Heretofore, the Court has exercised supplemental jurisdiction over these claims based on the Court's original jurisdiction over Plaintiffs' federal-law claims. 28 U.S.C. § 1367(a). Where the district court "has dismissed all claims over which it has original jurisdiction," the court may decline to exercise supplemental jurisdiction over any remaining claims. 28 U.S.C. § 1367(c).

The Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).

In granting Defendants' motions for summary judgment in part, the Court dismisses all pending federal-law claims. As a result, there are no remaining claims over which the Court may exercise original jurisdiction. The Court now declines to exercise supplemental jurisdiction over the remaining state-law claims against Defendants Williamson and Burnett, pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, the Court will dismiss those claims without prejudice.

## IV. Conclusion

For the reasons stated above, Plaintiffs' motion (doc. 72) is due to be denied as moot, and Defendants' motions (docs. 63, 66, and 68) are due to be granted in part. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on November 18, 2019.

L. Scott Coogler
United States District Judge

199455